Filed 8/2/23  P. v. Wright CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B318839 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. A383951) |
| v. | |
| EDWARD JUDSON WRIGHT, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Laura F. Priver, Judge.  Affirmed.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Edward Judson Wright appeals from the order denying his petition for resentencing pursuant to Penal Code section 1172.6, entered after an evidentiary hearing held pursuant to subdivision (d) of that statute.[1] Defendant, who requests de novo review of the issues, sets forth as grounds for reversal that substantial evidence did not support a finding that he directly aided and abetted the killing with intent to kill and that the trial court erred as a matter of law in concluding he was a major participant who acted with reckless indifference to human life. Defendant also contends the order denying his resentencing petition cannot be affirmed under a theory of aiding and abetting second degree implied malice murder.

We conclude substantial evidence supports the trial court's finding that defendant was a major participant who acted with reckless indifference to human life, and he was thus guilty of felony murder under current law. As we affirm the trial court's ruling on that ground, we do not reach defendant's other contentions.

## BACKGROUND

### 1983 conviction

In 1982, defendant and his brother Curtis Duane Wright (Curtis)[2] were charged with the murder of Donald Houts and robbery and burglary of the victim's home, as well as three additional robbery counts against separate victims. The

---

[1]     All further unattributed code sections are to the Penal Code unless otherwise stated.

[2]     As defendant and his brother share their last name, we refer to Curtis by his first name to avoid confusion.

2

information also alleged that Curtis had been armed with a firearm. After defendant's and Curtis's trials were severed, defendant waived a jury trial and agreed to the admission into evidence of a portion of the preliminary hearing testimony in addition to live testimony. Following a court trial defendant was convicted of first degree murder (§ 187, subd. (a)), three counts of robbery (§ 211), and one count of burglary (§ 459), along with true findings that a principal was armed in the commission of the offenses. On May 17, 1983, defendant was sentenced to a total term of life in prison plus seven years. The judgment was affirmed on direct appeal. (*People v. Wright* (1987) 43 Cal.3d 487, 499; *People v. Wright* (Dec. 13, 1985, B044607) [nonpub. opn.].)

**Section 1172.6 petitions**

Prior to 2019, when an accomplice killed another during an inherently dangerous felony such as robbery, an aider and abettor of the robbery could be convicted of murder without a showing of intent to kill or implied malice. (*People v. Strong* (2022) 13 Cal.5th 698, 704, 707.) Effective 2019, the Legislature amended section 189, subdivision (e) to limit felony murder liability to actual killers, aiders and abettors with the intent to kill, or major participants in the underlying felony who acted with reckless indifference to human life as described in section 190.2, the statute defining the felony-murder special circumstance. (*People v. Strong*, at pp. 707-708; Stats. 2018, ch. 1015, § 1, subd. (f).) The Legislature also added section 1172.6, which provides a procedure for persons convicted of murder to seek retroactive relief if they could not be convicted under sections 188 and 189 as amended effective January 1, 2019. (*People v. Lewis* (2021) 11 Cal.5th 952, 957.)

3

In May 2019, defendant filed a petition for resentencing under section 1172.6, and the trial court summarily denied the petition.  We reversed the denial of the petition and remanded the matter for further proceedings pursuant to section 1172.6, subdivision (c).  Following remand, the trial court entertained briefing from both sides and held an evidentiary hearing pursuant to section 1172.6, subdivision (d), in which the prosecutor was required to prove beyond a reasonable doubt that defendant remained guilty of murder under section 188 or 189, as amended effective January 1, 2019.  (See § 1172.6, subd. (d).)

The parties stipulated the court could consider the following evidence: the three prior appellate opinions in the matter; the preliminary hearing transcript; the reporter's transcript of the 1983 trial; the transcript of a recorded interview of defendant by detectives on October 20, 1982; and the autopsy report.  After reviewing the evidence and analyzing it under the factors outlined in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) and related authority, the trial court found the evidence established defendant was a major participant in the robbery and burglary against Houts and acted with reckless indifference to human life.  The court also found defendant was a direct aider and abettor in the murder and acted with intent to kill.  On February 25, 2022, the court denied the petition.

Defendant filed a timely notice of appeal from the order of denial.

**Relevant prosecution evidence**

### *Owens robbery*

Percy Owens testified that at the time of the incident he was 70 years old with a heart condition and back problems, living

4

in a trailer on his Lancaster farm when defendant, who was referred by the unemployment department, went to work for him. Defendant worked for Owens for approximately three weeks as a handyman until Owens fired him. Thereafter, on December 13, 1978, Owens drove onto his property around 11:30 a.m., got out of his car holding a loaf of bread, his keys, and a newspaper, and was confronted by defendant pointing Owens's own .12-gauge shotgun at Owens. The gun was kept inside Owen's trailer, and he had seen it that morning before he left for an errand. No one else was around. Owens walked up to defendant, repeatedly pushed the gun away after defendant repointed it. Defendant hit Owens two or three times on the back near the shoulder with the stock of the shotgun, breaking it and causing Owens to fall. Defendant ordered Owens into the trailer, where Owens saw a window had been broken since he left that morning, and the front door was open.

Inside, defendant shoved Owens into a chair, causing glass in a display case to break. Defendant tied up Owens, threw the shotgun on the couch and returned outside. Defendant locked himself out, and Owens was able to get loose and call law enforcement to report having been beaten and held up with a shotgun. Defendant came back in through the window, again tied up Owens and pulled the phone off the wall. Defendant took a small antique pistol from the broken display case, Owens's credit cards and driver's license from the wallet in his pants, and demanded that Owen sign some checks. Owens, afraid because he knew defendant carried a knife, signed three checks. Defendant took the keys Owens had dropped on the ground outside and drove off in Owens's car.

Owens had never met Curtis, and did not know defendant had a brother.

### *Events before, during and after the Houts murder*

In 1982 Houts was a 56-year-old pheasant farmer, who lived alone on a ranch in rural Lancaster. Defendant worked for Houts for about three weeks in late August and September, feeding birds and building cages, while living with his mother, sister, Curtis, and another younger brother in Lancaster. Eventually defendant and his girlfriend, Roberta Fahey, rented an apartment in a town 11 miles outside of Lancaster. Curtis lived with them the last two weeks they were there. Fahey worked cleaning house for Houts approximately four days.

Defendant left his job with Houts around September 22 or 23, 1982, and about that time, defendant told Fahey Houts had shown defendant his guns. On September 28, Fahey accompanied defendant to a Palmdale pawn shop where he purchased an unmodified shotgun, which he gave to Curtis two or three days later. The barrel was then sawed off.

During the following days, Curtis used the shotgun to commit robberies in Palmdale, Quartz Hill and Lancaster, aided by defendant, who provided the transportation. An employee of the Lancaster drive-in movie theater testified while working in the box office, at 8:30 p.m. on October 2, 1982, he was robbed at gunpoint by Curtis with a sawed-off shotgun. A cashier at the Quartz Hill Circle K market, about five miles from Lancaster, testified she was robbed just after midnight on October 4, 1982, by a man who pointed a saw-off shotgun at her. In court she identified defendant as the robber. Fahey testified that Curtis told her he committed the robbery of the Circle K with the sawed-off shotgun. An employee of a 7-Eleven store in Palmdale

6

testified she was robbed on October 5 at 11:15 p.m. by a person with a single barrel sawed-off shotgun. As he left the store, he put the shotgun up his right sleeve, asked if she would wait two or three minutes before calling the police, and walked eastward down the street. She did not see a car and was unable to identify the robber.

Fahey testified that on Sunday, October 10, 1982, defendant came home between 2:30 and 3:30 p.m., upset and angry with Curtis. Defendant said he did not want Curtis to live there anymore because Curtis was going to cause trouble in which defendant did not want to be involved. Curtis came home about an hour and a half later with the sawed-off shotgun, which had a broken butt, two other guns, some tools, a television set, and a vacuum cleaner. Fahey recognized the vacuum cleaner and television set as belonging to Houts. They put the tools and vacuum in the car, and all went to Shorty's swap meet together. The owner of the swap meet, Irving Dwosh, testified he purchased the items from Curtis for $36.

Brian Curran, a recently hired employee of Houts, identified the items in a locked storeroom at the swap meet as belonging to Houts. Curran also testified Houts owned a red truck and an AMC Pacer. When Curran went to work Monday, October 11, the truck was there, but the Pacer was not. He did not see Houts that entire day.

Later, defendant told Fahey that he and Curtis went to Houts's ranch that day for Curtis to inquire about a job. Defendant parked away from the house and waited in the car while Curtis walked to Houts's house. Later, when defendant approached the house, he discovered Curtis had killed Houts and became angry.

After relatives reported Houts missing, law enforcement went to Houts's property on October 13. They found bloodstains and a portion of a shotgun shell in the living room, but did not find Houts's body until October 16, when a sheriff's posse found it about a quarter mile behind the house in a four-foot square duck blind.

The same day defendant and Fahey were arrested in Hagerstown, West Virginia by local law enforcement, who notified Los Angeles County Sheriff's Detective Raffa, who was in charge of the Houts investigation. He and Sergeant Parra then went to West Virginia to interview defendant and Fahey.

### *Postarrest interview*

Defendant said, after telling Curtis about Houts's guns, on October 10, 1982, they went to the ranch sometime after noon with the sawed-off shotgun. Defendant had also told Curtis about the tools and color TV and suggested they wait until Houts left, go there, and burglarize the place

Defendant said he waited in the car where Houts would not see him, and eventually heard Houts shouting at Curtis about something. Defendant then saw Curtis run back into the house. Defendant heard a couple of thumps, as though Curtis were kicking or hitting Houts. Later, defendant determined Curtis had hit Houts with the sawed-off shotgun, which broke parts of the gun. After defendant heard a gunshot, Curtis came to the door saying, "[W]hatta I do now, what do I do now[?] He's still alive." Defendant threw up his hands and started to walk away, when Curtis came out of the house and said something again about the gun being broken. Defendant replied, "[H]ey you did it, you're gonna have to deal with it . . . ."

Defendant said that "there was a bunch of hollering and stuff back and forth and then the next thing I know [Curtis] picked up [Houts's gun] and . . . shot him again and then . . . once he did that, I couldn't do nothing but . . . help . . . try to clear the place up.  [¶]  . . .  [¶]  . . . So we scrubbed the carpets in the room."  Defendant explained that Curtis "wasn't even suppose to stay there if [Houts] was home.  I could see burglarizing the guy.  Once he was dead . . . I'm already there and I'm involved in it . . . ."  Defendant and Curtis dragged Houts to his pickup truck, took him out to a duck blind behind the property, put him in a hole there, covered him up, and went back to clean the mess.

The brothers took checks, the television, rifle and shotgun, and then the drill, skill saw, and chain saw.  They put everything into Houts's Pacer, and Curtis drove defendant in the Pacer to defendant's car.  Defendant drove home and when Curtis arrived about an hour later, they went to Shorty's to sell everything except the guns and TV, which they kept.  They went out for a drink, and defendant later told Fahey what happened.  The brothers threw the sawed-off shotgun out into the desert.

The next day, defendant filled out the two checks taken from Houts,  claiming that Curtis forced Houts to sign them before defendant arrived at the house.  Curtis then cashed the checks, and defendant, Curtis and Fahey went shopping, mostly for clothes.  Curtis rented a U-Haul tow bar and hooked defendant's car to the Pacer.  They placed all their things in defendant's car and drove to Martinsburg, West Virginia.  Not finding an apartment to rent there, defendant and Fahey rented one in Hagerstown, moving in that night.  Curtis stayed in Martinsburg to look up an old friend.

**Defense evidence**

### *Testimony of defendant's mother and sisters*

Defendant's mother, Lynn Jordan, testified defendant was 28 years old, and Curtis was 20. She divorced their father in 1963. Defendant lived off and on with his father then came to live with her when he was about 14 or 15. She gained custody of Curtis when he was 12. She described Curtis as both a loner and a leader. When she told him what to do, he would close up like a clam and go away. Curtis associated with people three or four years younger, such as the friends of his younger brother Ricky, who was 15. Curtis entertained them and they looked up to him. Jordan had been afraid of Curtis since he was very young. When she got custody of him, he was so uncontrollable she turned him into the county to be sent back to his father. Curtis had two sides, one very friendly and sweet and one as cold as ice. He killed two of her kittens, strangled one and hit the other against the back of a bus bench.

Jordan described her relationship with defendant as good most of the time, and she thought defendant as less likely to lead than Curtis. Defendant and Curtis lived with her until about three weeks before they and Fahey went to West Virginia. Jordan claimed defendant and Curtis did not get along very well, perhaps because Curtis could not dominate defendant. She did not think defendant was violent, although she was aware he had been to prison twice. He stole a car when he was 15 or 16 and he went to prison in the Owens case. She, Curtis and the rest of the family knew about the Owens case and had read the preliminary hearing transcript.

Defendant's 26-year-old sister, Coralyn Berry, testified when she lived with Curtis, he did not listen to her or anyone,

10

and did whatever he wanted to do. She thought Curtis looked up to defendant, who got more attention than Curtis. Like Jordan, Berry claimed defendant was not violent, but Curtis knew about the Owens incident and that defendant went to prison. Berry recounted an incident that occurred when Curtis was living in a foster home and was given a hamster. When the hamster would not use his wheel, he took it outside, threw it on the ground, and it died.

Defendant's 22-year-old sister, Lisa Wright, testified she lived with her father and Curtis until she was 18 years old. She also considered Curtis to be a leader who played with younger people so he could lead. If he could not lead, he would just sit and sulk. All his life he wanted to be like defendant and wanted to do exactly what defendant did. She confirmed Curtis knew about the Owens case as did everyone in the family. She also thought that defendant was not violent. It was Curtis who often got in trouble. He went to jail in Chicago for a couple months and spent time in juvenile hall before that. Curtis mistreated the family cat. He would also find snakes and throw them onto the electric fence on their property to watch them fry.

### Defendant's testimony

Defendant testified that on October 10, 1982, he thought of a plan to burglarize Houts's house. Curtis would go to the house to see whether Houts was home. Defendant was aware of Houts's habit of going to his mother's house for dinner on Sundays. Houts would leave in the afternoon to shop before dinner, so the plan was to go the house around 2:00 p.m. Since Houts had never met Curtis, he would first go up alone to see whether Houts was home. If Houts was home, Curtis would ask for work, have a little conversation, then return to defendant, waiting out of sight.

11

They would then wait until they saw Houts's car go by, and then burglarize the house and surrounding property.

When they arrived, defendant could not see whether Houts's Pacer was there, as his view was blocked. Curtis went to the house, taking the sawed-off shotgun with him. Defendant waited about 20 minutes to a half hour before deciding to walk toward the house. When he was about a third of the way there, Curtis stepped out, waved defendant to come, and went back in. Defendant claimed it was then he heard a muffled shot and started jogging up to the house. Curtis came running out and yelled, "I shot him. He's still alive. What do I do?" Defendant replied, "You've done it, I'm getting out of here. I'm out of it."

Defendant claimed he turned around and started walking back toward his car, and Curtis went back into the house but came running back out right after defendant heard another gunshot. Curtis yelled for defendant to help him. Defendant figured Curtis had killed Houts and said, "Well, I've got to help you." They went into the house, where defendant helped Curtis drag Houts out and put him in the back of the red truck, which they drove to the back of the property, where they placed Houts in a hole and covered him. The brothers returned to the house to steal things. The next day defendant cashed some checks taken but denied he told Curtis to make Houts sign them. Defendant admitted he made Owens do that in 1978.

Defendant claimed they had planned only a burglary, not a robbery, and when he found out Curtis had hurt Houts, he was shocked. He claimed he had no way of knowing Curtis could do something like that, especially that he would shoot somebody, although Curtis had always been "shaky." At the time defendant just wanted to leave the area and later got angry.

12

On cross-examination, defendant testified he quit his job with Houts around September 22 or 23 and claimed he gave Curtis the shotgun as an early birthday present about three days after he got it, which was two weeks before Sunday, October 10. It was Curtis who sawed off the barrel, and it was the same sawed-off shotgun they used in the other robberies. Defendant claimed on October 10 they left his apartment between 11:00 a.m. and noon, intending to go to a swap meet in Four Points, about 15 miles north of Houts's house. They took the shotgun to hunt quail, as well as pheasants that had strayed from Houts's ranch. Defendant admitted after the barrel was sawed off, the gun was no longer good for hunting.

They found no quail. Curtis shot off rounds while defendant listened to the radio in the car. Curtis got bored with shooting and they began talking about guns. Defendant told Curtis about Houts's guns and his habit of going out on Sunday afternoons. Defendant proposed they could wait until he was gone, go up to the house, which Houts did not lock, and take the guns and whatever else they found. Since defendant did not know what time Houts usually left, the plan was for Curtis to go to the house and if Houts was not home, Curtis would signal defendant to come in. If Houts was home, Curtis would inquire about employment and return to the car where they would wait 1/2 mile away until they saw Houts's car pass.

Curtis began walking to Houts's house from a quarter mile away at 1:00 p.m. Defendant assumed the shotgun Curtis took with him was loaded. Curtis assured defendant he would keep it tucked under his jacket. Defendant made no objection. When asked whether he thought that Curtis would be hostile if defendant told him not to take it with him, defendant replied,

13

"That's hard to say.  Curtis is hard to figure, sometimes.  He might sometimes and he might not."  Defendant claimed when they committed the other robberies that month, he had not let Curtis load the shotgun.  Defendant kept the shells from Curtis.

Defendant waited in the car for 20 to 30 minutes, became worried, so he started walking up the driveway.  Defendant described the ensuing events as he had before, and testified after he heard the second shot and turned back toward the house, Curtis came out yelling for help.  As defendant walked toward the house, Curtis said, "He's dead," and something to the effect of, "He broke my shotgun," and "What do you think we should do now?"  Defendant replied, "We'll have to get rid of the body or hide it somehow."  After taking the body out they tried to clean up inside the house.  They put the stolen property in the Pacer and drove it to defendant's car.

## DISCUSSION

### I.    Standard of review

Relying primarily on *People v. Vivar* (2021) 11 Cal.5th 510, 524-528 (*Vivar*), defendant urges a de novo standard of review, which unlike a substantial evidence review, would give no deference to the trial court's findings.  He contends a de novo review is appropriate because the trial court's factual determinations were based solely on the "cold record."  *Vivar* is an inapt comparison as it involved whether there had been a sufficient showing of prejudice to vacate a conviction by those facing negative immigration consequences—a ruling that was predominantly a question of law.  (*Id.* at pp. 517, 524.)  Here, the issue is whether defendant harbored the mental state required for a murder conviction under section 188 or 189 as amended,

14

which is predominantly a question of fact.  (See § 1172.6, subd. (d); *People v. Clements* (2022) 75 Cal.App.5th 276, 296-301.) Moreover, the holding in *Vivar* was expressly limited to proceedings pursuant to section 1473.7.  (*Vivar, supra*, at p. 528, fn. 7.)

Defendant acknowledges but disagrees with the decisions of the Courts of Appeal that have distinguished *Vivar* and held on appeal the trial court's ruling under section 1172.6 is to be reviewed for substantial evidence.  (See *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 232-233; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 590-591; *People v. Clements, supra*, 75 Cal.App.5th at pp. 296-301.)  We agree with the reasoning of the foregoing cases and decline to apply a de novo review.

Defendant argues the evidence shows only a burglary was planned but was transformed on Curtis's whim into a violent armed robbery and an unexpected shooting.  Essentially defendant argues the evidence favored a findings that he did not intend to kill and was not a major participant who acted with reckless indifference to human life.  Defendant's analysis is limited to the evidence and inferences that support that view. However, since we review the trial court's ruling for substantial evidence, our task is to determine whether such evidence supports the trier of fact's finding, not whether substantial evidence supports a contrary finding.  (See *People v. Saterfield* (1967) 65 Cal.2d 752, 759.)

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must

presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) "[B]ecause 'we *must* begin with the presumption that the evidence . . . *was* sufficient,' it is defendant, as the appellant, who 'bears the burden of convincing us otherwise.'" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1430.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conclusion of the trier of fact].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

## II. Major participant with reckless indifference
### A. Banks *and* Clark *factors*

We first address defendant's contention the trial court erred in finding he was a major participant who acted with reckless indifference to human life.

After the Legislature amended sections 188 and 189, the California Supreme Court held its decision in *Banks* "substantially clarified the law surrounding major participant findings," and its decision in *Clark* "then substantially clarified the relevant considerations for determining whether a defendant has acted with reckless indifference to human life." (*People v. Strong, supra*, 13 Cal.5th at p. 721.) Thus, the court concluded that "[s]ection 1172.6 offers resentencing for petitioners who have not been determined beyond a reasonable doubt to have the

16

degree of culpability now required for a murder . . . conviction." (*Id.* at p. 720.)

In *Banks* and *Clark*, the California Supreme Court was guided by the reckless indifference requirement first articulated in *Tison v. Arizona* (1987) 481 U.S. 137 and *Enmund v. Florida* (1982) 458 U.S. 782 in relation to the imposition of the death penalty. In clarifying the definitions of major participant and reckless indifference to human life in *Banks* and *Clark*, the court suggested relevant considerations for the factfinder in making that determination. (*Clark, supra*, 63 Cal.4th at p. 611; *Banks, supra*, 61 Cal.4th at p. 803.) The two requirements significantly overlap, as the greater the defendant's participation in the underlying felony, the more likely it is that he acted with reckless indifference to human life. (*Clark, supra*, 63 Cal.4th at p. 615.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient" (*Banks, supra*, 61 Cal.4th at p. 803); what matters is the totality of the considerations (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*)).

**B.** *Major participant*

Factors used to determine whether a defendant was a major participant include the role played by the defendant in planning the underlying crime; in supplying or using a lethal weapon; the awareness of the defendant of the particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants; the defendant's presence at the scene of the killing; and the defendant's action after lethal force was used. (See *Clark, supra*, 63 Cal.4th at p. 611; *Banks, supra*, 61 Cal.4th at p. 803.)

Here defendant's own admissions provide considerable substantial evidence to support a finding of all factors suggested

17

by *Banks* and *Clark*. Defendant admitted he thought of a plan and suggested it to Curtis, and the evidence of the remaining factors indicate he intended both burglary and robbery. Defendant admitted he supplied the lethal weapon; he was aware of the particular dangers posed, since the weapon was a sawed-off shotgun; and he knew Curtis took the presumably loaded shotgun to Houts's house. If the plan was a burglary and Curtis was to return to the car if Houts were home, there would be no need for a lethal weapon. In addition, we note striking similarities to the Owens robbery: Houts and Owens were both tied up, and both forced to sign checks. Also Curtis claimed to have hit Houts with the butt of the gun, just as defendant had done to Owens, suggesting defendant shared his methods with Curtis.

Defendant's awareness of the danger may be reasonably inferred from defendant's refusal to let Curtis have ammunition for the shotgun during the recent prior robberies involving defendant, combined with the knowledge Curtis had always been "shaky" and might become hostile if told what to do, for example, commit a robbery with an unloaded gun.

In addition defendant admitted after lethal force was used, he helped hide the body, clean up the blood, steal Houts's property and load it into Houts's car, dispose of the sawed-off shotgun, and fill out and cash the checks. In sum, defendant's participation was a significant or major part of the planned burglary and robbery. He was not simply the getaway driver, as he suggests.

## C.    *Reckless indifference to human life*

Regarding reckless indifference to human life, *Banks* explained it as engaging in a felony known to carry a grave risk of death while ""*subjectively* aware that his or her participation

in the felony involved a grave risk of death.""" (*Banks, supra*, 61 Cal.4th at pp. 801, 807.)  "[O]nly knowingly creating a 'grave risk of death' satisfies the constitutional minimum" articulated by the United States Supreme Court in *Tison v. Arizona, supra*, 481 U.S. at page 158 and *Enmund v. Florida, supra*, 458 U.S. at page 798.  (*Banks, supra*, at p. 808.)  Thus, those charged with felony murder "who simply had awareness their confederates were armed and armed robberies carried a risk of death, lack the requisite reckless indifference to human life."  (*Id*. at p. 809.)

In *Scoggins*, our Supreme Court gleaned factors from *Banks* and *Clark* to guide the determination whether the defendant was subjectively aware that his participation involved a grave risk of death.  (*Scoggins, supra*, 9 Cal.5th at p. 677.)  Factors include: "Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?"  (*Ibid.*, citing *Clark, supra*, 63 Cal.4th at pp. 618-623.)

Here defendant was not simply aware Curtis was armed and that armed robberies carried a risk of death.  Rather defendant knew Curtis took a loaded sawed-off shotgun with him to Houts's house, and defendant accepted Curtis's assurance that he would hide the gun in his clothing.  Given the gun was so easily hidden, it is probable the shotgun barrel was sawed off to a length banned by California law since 1961.  Such a modification

19

creates a weapon "normally used only for criminal purposes" and known to be dangerous "because these guns combine lethality at the short distances characteristic of the typical criminal attack with a concealability and ease of handling . . . ." (*People v. Brown* (2014) 227 Cal.App.4th 451, 464; see former § 12020, now § 33215.) Defendant admitted he knew this was not a gun designed for sport hunting, and he also knew Curtis had access to Houts's guns.

Defendant may not have been inside the house when the fatal shot was fired, but he was sufficiently close to the crime scene to have had the opportunity to restrain the crime or at least aid the victim. When defendant spoke to detectives a few days after the murder, he said as he approached the house, Curtis was outside waving him in, and he heard Houts shouting. Curtis ran back into the house, and defendant heard a couple of thumps, as though Curtis were kicking or hitting Houts, and then the first gunshot. Defendant's response when Curtis came to the door and said, "[W]hatta I do now, what do I do now[?] He's still alive," was to throw up his hands and start to walk away. When Curtis said something again about the gun being broken, defendant replied, "[H]ey you did it, you're gonna have to deal with it . . . ." Under defendant's own scenario, the killing of Houts was not sudden or unanticipated.

Defendant complains the trial court interpreted his statement as directing Curtis to go back and kill Houts himself. As Curtis did go right back in to finish the job, the court's interpretation was not unreasonable. Regardless, defendant's own statements show the killing of Houts was not sudden or unanticipated, as he asserts. Defendant had time to at least try to prevent the killing, but instead walked away. Furthermore,

20

defendant has never claimed to have attempted to aid Houts before or after his death.

The murder was not unforeseeable. Defendant was 28 years old, and Curtis was 20. Curtis looked up to defendant, wanted to be like him, and although Curtis would not do what *others* told him to do, he committed three robberies with defendant without ammunition in his weapon, as defendant had insisted. It is reasonable to infer that on the day Curtis murdered Houts defendant could have insisted Curtis leave the shotgun behind, and thereby reduce the risks of violence. Curtis had a propensity for violence. He violently killed a pet hamster because the creature would not do what Curtis wanted. He tortured snakes to death by throwing them onto an electric fence. He mistreated the family cat and killed two kittens, one by strangulation and one by smashing it against a bus bench. Given defendant's mother and two sisters knowledge of Curtis's propensity for violence, it is unlikely defendant was not aware of it.

Considering the totality of the circumstances, we conclude substantial evidence supports the trial court's finding defendant was a major participant in the burglary and robbery and that he acted with reckless disregard for human life, such that a rational trier of fact could find beyond a reasonable doubt that defendant remains guilty of felony murder under section 189, as amended effective January 1, 2019. As we have found sufficient evidence to support this finding, we need not reach defendant's contention that there was insufficient evidence to support the trial court's finding that defendant was a direct aider and abettor who had acted with the intent to kill, or defendant's contention that the court's order cannot be affirmed on the basis of the prosecutor's

theory of implied malice murder.  (See *People v. Lopez* (2018) 5 Cal.5th 339, 354.)

## DISPOSITION

The order of February 25, 2022 denying defendant's section 1172.6 petition is affirmed.


_____
CHAVEZ, J.

We concur:


_____
LUI, P. J.


_____
ASHMANN-GERST, J.